The Honorable. The United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and the times will be allotted to counsel. The case today is Financial Oversight and Management Board for Puerto Rico et al. v. Federacion de Maestros de Puerto Rico, Inc. et al. Appeal number 22-1080. Attorney Mendez, please introduce yourself for the record and proceed with your argument. Yes, good afternoon. This is Jessica Mendez-Kohlberg on behalf of the Teachers Association. With this Court's permission, I would like to reserve three minutes for rebuttal. Yes. Thank you, Your Honor. As this Court has already recognized, time is of the essence. The Oversight Board has set a target date for the effectiveness of the Plan of Adjustment for March 15, and despite the Teachers Association's efforts, nothing seems to be able to dissuade them of that date. For this reason, we have requested this Court to say the confirmation order while this appeal is pending, which should not be very long given that this Court already granted an expedited schedule. In its opposition to the motion for stay, the Oversight Board now claims that if the plan goes effective without delay, but the Court orders the Association's defined benefit plans reinstated, the Board will manage to balance the budget. Respectfully, this is an attempt to convince the Court that a remedy can be granted without affecting the implementation of the plan and that there is no need for a stay. First, the fact that the Board proposes this alternative remedy after it considers the Association's odds of success shows precisely the likelihood of success on the merits. But second, this statement is astonishing considering that the Oversight Board has consistently pushed the idea that without the freezes and the eliminations of benefits and the reforms to the retirement system, the plan would be unfeasible. To name a few examples, the Oversight Board... Yes, Your Honor, and this is the first time that the Oversight Board has stated that alternative because before, to the District Court, they have represented that the freezes were necessary in order for the plan to be feasible. They even stated that the preemption of the retirement laws was necessary or otherwise the plan would be unfeasible. And now, because they have considered the odds of success, the Board determined that the defined benefit retirement plan for the teachers is doable without making its confirmed plan unfeasible, all to prevent this Court... Ms. Mendez, I read what they're saying is not a concession on the likelihood of success on the merits, but is addressing one of the other requisite statutory factors. And secondly, is saying that dealing with this by cutting the budget would be very bad, but not as bad as having the plan not be in effect. So, I'm not sure I read it the same way you do. Yes, Your Honor, but what they are not mentioning is the fact that they have always argued that the plan was not feasible if they didn't do the freezes and the reforms. And particularly with the freezes, they have submitted even expert opinions as to the fact that if these freezes are not implemented through the plan, then the plan would be unfeasible. Now, opposing counsel would probably argue to this Court that because they have made that particular statement, they would be bound to do it if the Court ordered them to, but such statement is rather simplistic and does not place the Court in the position to really consider it. And the point is that even if the Court were to consider this alternative remedy so that it doesn't have to issue the order for a stay, it is still not a practical remedy that can be granted absent a stay. Let's remember that this Court analyzed the factors for issuing for the equitable witness in the Pinto Lugo case where the first factor was the diligence of the movements and we have established our diligence. But the second factor was if the Court was able to provide an effective practical remedy. So here, even if the Court was able to order the Oversight Board to reinstate the retirement system as a defined benefit as they stated in their motion, still it wouldn't be practical without the stay. If the Board is allowed to continue with the consummation of the plan as a whole or even considering the provision... You said it wouldn't be practical without the stay? Without the stay. Okay. Correct, without the stay. It wouldn't be practical without the stay because the Oversight Board would still consummate the plan and particularly with respect to the provisions regarding the retirement system if a stay is not granted. Ms. Mendez, you've really got me puzzled. I would think that when the Board said that even if you don't get a stay, as long as you are correct on the merits, your clients will be made whole. I would think you would have been very happy to hear that and embraced it. Yes, Your Honor. But the fact is that we need to consider if by the time that the Court can hear the case and decide on the merits, if the Court is able to provide the practical remedy. The remedy that the appellants are requesting including what the Board stated about reinstating the retirement system. Could you help us think through why what they're saying now isn't a practical remedy? Yes, that was precisely my point right now. That if the Board is allowed to consummate the plan and with respect to the retirement system, by the time that this Court would be able to enter a decision on the case, on the merits, the retirement system would be dissolved. The Commonwealth would have recoded, for example, the payroll system to modify the employee withholdings according to the freezes. The freezes would be effective on, let's say, March 15. No other pension benefits would be accrued. The Commonwealth would have likely established the merits. If you were successful, we're just talking about recomputation of figures and award of money damages, which would go back into the pension fund. Why is that not a proper way to think about this? Well, because in practice, there would be a lot of actions that would be taken in order to implement the provisions of the plan, not only about the retirement system, but also about the entire plan. For example, all the billions of dollars in distributions, it all comes from one budget. By the time that the Court is able to address this appeal on the merits, all of those actions will be difficult to unravel in order to provide the remedy. Are you telling us, in effect, that if we don't grant the requested stay, you lose the whole case because we won't be able to undo it afterwards? Is that what you're telling us? Well, Your Honor, the Teachers Association complies with one of the factors, which is the likelihood of success, because the legal issues... You seem to be saying that if we don't stay this, then it goes into effect and it can't be undone, so therefore you'll lose. That's what you seem to be saying. Because it's very likely for equitable mootness to come into place because of the stage of the consummation of the plan and the difficulty of unraveling all the actions taken and the effect on, let's say, third parties that have relied on the actions already taken by the Board due to the implementation of the plan. Could I ask you a question to clarify? We're on an expedited basis here, so I wanted to clarify a few things. Does the pension plan that's currently in effect under the current laws, as they now stand, does that remain in effect until the plan goes into effect on or about March 15th? Your Honor, I'm sorry because you caught up a little bit there, but if your question was, does the plan remain as it is right now until the effective date? Sure. Pretend I'm one of the participants in this pension plan and I started working prior to 2014. Am I tomorrow continuing to accrue benefits under the existing plan? Yes, until the effective date, which is also the free date. Do I currently have a commitment as of today from the Commonwealth that if I continue to work past March 15th, I will continue to accrue benefits under the current statutes? It depends if the employee was hired before 2014. Those are the ones that are in the defined benefits. Yes. In my example, I'm pretending I was hired prior to 2014. If I was hired prior to 2014, do I currently have a claim that if I work past the 15th of March, I should be able to accrue new benefits? No, because the benefits freeze on the effective date and after that, they will be enrolled in the defined contribution plan. Sure. Let me clarify the question. Assuming the plan doesn't go into effect, do I today have a claim that if I work after March 15th, I get an opportunity to have further accrual and COLA benefits if I started working prior to 2014? That is correct. If the plan does not get into effect in March 15th, which is the proposed date. Referring to me as the hypothetical employee, and given that I currently have that claim, how is the board supposed to deal with or treat that claim or adjust it? Well, once the effective date and the freeze date comes in March 15th, then they will be enrolled in the defined contribution plan for Act 106, meaning that they would stop accruing benefits pursuant to a defined benefit plan. But doesn't the board have the right and obligation to treat all claims, including claims to future benefits? To treat equally the claims. Sure. There's a lot of claims against Puerto Rico. That's why there's a bankruptcy proceeding. Doesn't a plan of adjustment need to adjust in some way and explain how it's treating all of those claims, particularly ones it's impairing? Yes. Yes, of course, Your Honor. And the claims pursuant to the pension obligations can be treated under the plan and discharge, et cetera. Our point on this appeal is the issue of the preemption and the oversight board not being able to legislate different reforms that are needed for the retirement systems through the plan, because here, different from Chapter 9, the oversight board does not have the power to legislate. As to that point, counsel, I would just like to follow up on Judge Cayada's question. What theoretically, take the case of, I'm going to narrow the group a little more, a current retiree who was employed prior to 2014, but is a current retiree. Theoretically, what legal principle would prevent present valuing that person's claim to future benefits and simply paying them or paying everybody in that group on a prorated basis? Isn't that how bankruptcy typically works? Is there some principle that would prevent that from happening despite the existence of the defined benefit law? Yes, Your Honor. The issue of the discharge or impairment of individual pension obligations is not what we are questioning in this appeal. It's rather the sweeping declaration that the plan is able to preempt statutory provisions and change the nature of the retirement system without legislation to that effect. I'm not trying to hold you to this, but I take it your answer to my question is that you don't know of a principle that would have prevented present valuing those claims and paying them. Well, the issue is that because it's a matter of discharging those claims or treating them during the restructuring, it's something that the board can do, but the issue here is not whether they can discharge those claims or give the certain treatment to the pension obligations. It's the way that they are restructuring the entire retirement system, even for the future after the effective date, that requires legislation, and it is done only through an exhibit of the plan. So when you say for the future, whose interests are you referring to? In terms of the employees. The employees, for example, future teachers that are hired after the implementation or the effective date of the plan, for example. Well, wait, so those folks, as I understand it, would come in under Law 160 of 2013, and they'd be in a defined contribution system anyway. They would come in Law 106. I'm sorry, 106, yeah. Yes, 106, but the changes that the oversight board is doing are not only with respect to the accrual of the pension benefits, for example. It's making other structural changes, particularly from ACTS. So I'm just trying to understand. So this group of people who haven't been hired yet, who presumably would only come in under the new structuring anyway, if the retirement system were to change how they were treated and put them, for example, into a new defined benefit plan, wouldn't the board have the authority to prevent payment under PROMESA to those people? Despite the existence of whatever legislation is there, isn't that how this has been working all along? I don't believe they could, Your Honor, because those would be post-petition, but they would still be subject to the changes and amendments made to the actual statute as it is right now, and those amendments have been made through the plan of adjustment, and as I mentioned, without the board having the authority to amend Act 106. So there's a, as you know, there's a provision that provides for amendment to the Puerto Rico laws to enacting new laws, new pension plan, or implementing the current pension plan if approval is obtained by the Title III court on certain showings. Isn't the question about what the legislature might do in the future something that's really premature for us today? Couldn't that issue be decided if and when it takes place? If a future legislature decides to go forward and change the pension statutes without first getting the approval of the Title III court, wouldn't there then perhaps be a right cause of action at that point to decide this question that you're asking about? Especially if you start from the original premise that you acknowledge that they could just present value all the existing claims, the existing claim of future rights, they could present value those and pay them out. So aren't we a little premature in taking up that question? Well, first, Your Honor, for the government of Puerto Rico to be able to enact legislation that would somehow change the provisions of the plan as it is right now, it would take 10 years. So for 10 years, the teachers would be experiencing the effects of the plan and the freezes and the cuts and the reform. I appreciate what you're saying, Counsel, but the premise of my question was that if, and I'm not suggesting that this is what would happen, but if a legislature chose not to comply with that provision of the confirmation plan and went ahead and made these enactments anyway, wouldn't it be subject to an action at that point in time? What I'm really asking is why do we have to decide this question right now? It would be subject to an action in that moment, and the oversight board could act because the government is prohibited from enacting legislation. The board could act against the government. But the problem today, right now, is that in our view, the way that the restructuring of the retirement system has been done was by applying incorrectly the preemption doctrine. When we have a particular case here, different from Chapter 9, where the debtor is not the one that is filing the plan of adjustment, is not the one that prepared the plan of adjustment, and all the provisions of the plan that amend or preempt, for that matter, the actual statutory provisions for the retirement system are provided by the board without having the authorization to legislate pursuant to PROMESA. The district court has recognized that there is an awkward power sharing arrangement between the oversight board and the government, where the oversight board has a lot of power pursuant to PROMESA, but the only one that they don't have is the power to legislate. That is why PROMESA Section 314b-5 requires that there is enabling legislation in order for the plan to be confirmed and for its provisions to be implemented. So in that sense, the importance of the case as of today is that if it is not decided how the board was able to preempt all these retirement laws that are affecting the livelihood of all the teachers, of 20,000 teachers that are subject to the consequences of the plan as it is, then it sets a dangerous precedent for the future stating that the oversight board can just say in an exhibit of the plan that these laws are preempted in its entirety, because if we look at Exhibit K of the plan, it says that the retirement laws are preempted in their entirety, including Act 106. So in that sense, what is left if those laws are preempted? It's only the provisions of the plan, and the plan is not a law. The oversight board does not have the authorization of Pursuant to PROMESA to legislate in order to reform an entire retirement system. And it's not just about the treatment of those obligations, as I mentioned before. It's also setting eligibility requirements, extending the retirement age requirement until 63 years old. Ms. Mendez, could you spend a second? How do you account for Section 1123A3 theory? As I understand the board, the board is saying, your clients have this claim to future accrual rights. That's a claim that the board is going to adjust in a way that impairs those rights. It's therefore obligated under PROMESA to specify how it will treat those impaired rights going forward. And 1123 says that obligation to specify the treatment occurs notwithstanding any otherwise applicable non-bankruptcy law. And yet you seem to be telling us that there is Puerto Rico law that will prevent, stand in the way of the board specifying the treatment of these adjusted claims in a way that they have. And it's not clear to me why your theory trumps that 1123A3 language. Yes, and I'll provide an example of how the Puerto Rico law is preventing this certain treatment. For example, Act 106 expressly exempts the teachers that are hired before 2014. You misunderstood. I don't think they're disputing with you that the laws, if effective, would create a problem. I think they're precisely saying that because they would create a problem with the specified treatment, they are therefore overridden, pursuant to 1123A3 and pursuant to PROMESA itself, which authorizes the board to do this. Yes, and if we look at that section in the context of a Chapter 11, for example, yes, it has been analyzed that this plan can preempt the state law, but it is only saying that that particular debtor does not have to comply with the law. It is not saying that this law no longer applies or exists. In this case, the contention that the plan of adjustment here preempts state law is that it displaces the law, not just the obligations under the law. That's why it's different, because it's one thing to say that you can discharge the obligations pursuant to a law or that the plan can preempt the debtor. Preempt is not used in the actual sense of the doctrine, but that the debtor does not have to comply with those known bankruptcy laws, but it's only to the extent of the obligation, not to say that the plan can preempt the law itself entirely, which is what is happening here when we see that the Exhibit K states as laws that are preempted the entire law, and it's substituted with the provisions of the plan. Moreover, when discussing that issue of Section 1123, for example, the board-side cases, the Irving case, for example, and that case specifically states that that preemptive effect, it is not unbounded and that there is still a need to perform the preemption analysis and establish specifically what provisions of the statute would be preempted by the plan. But here it is a sweeping declaration that the laws are preempted. Moreover, that case also establishes that state law can only be preempted as to those specified means that are adequate for the plan's implementation. That is not happening here. Second, that the state law cannot be preempted if it is concerned with protecting public health, safety, or welfare. And we are talking about a welfare legislation. Act 106 establishes, the legislature establishes that it is enacting this law pursuant to the police power it has under the Constitution to provide the safety of its people. And third, that the state law preemption cannot extend to laws that define and protect the property rights of third parties. Council, I just want to ask you something about that. If part of the plan that, as you say, nullifies the law, eliminates the law, and prohibits the legislature from reenacting the law, I don't understand how that affects your clients. Judge Tejada has suggested, and I thought you agreed with him, that your clients can be treated under the plan. They are being treated under the plan. This idea of preempting or prohibiting, I'm sorry, prohibiting or attempting to establish new law as you describe it, I don't understand how that affects your clients. Well, your Honor, for starters, because it is one thing to say that we can treat the obligations in a certain way through the plan, but if the plan requires for those that are hired before 2014 to be then enrolled into the defined benefits, I'm sorry, the defined contribution systems, how can the board do that when the board cannot do that? Because you said earlier that they could take the step of present valuing the claims, all of the claims, and simply paying them, and this is much less draconian than that, isn't it? Well, your Honor, I respectfully disagree in the sense that the board is still, while preempting all this legislation, is still enacting legislation through the plan to establish a whole new set of rules for the administration and the operations of the retirement system, and that all affects, because it is included in the plan, affects the teachers upon the effective date of the plan. Let me ask if, yes, Judge Kayada, I can't hear you. I think you're muted, Judge Kayada. Yes. Go ahead. I'm sorry. No, I was going to pause to ask whether the court had additional questions at this time. Counsel, I did intend to give you another three or four minutes to complete your argument, but I do want to make sure the court gets a chance to ask questions if it has any right now. The only last thing I wanted to hear from counsel is you responded to Chief Judge Howard's question to you about isn't this plan less draconian by returning to your argument about statutory preemption, but you didn't answer whether it's less draconian than what possibly could be. You conceded it could be. Well, Your Honor, the effects of the plan, done through an improper preemption of the law, will condemn the teachers to reductions on their pensions, to work longer for a lower pension, when right now the pensions are already low. So we are talking about people that would have to wait until, for example, 63 years of age, until they could retire, with, as I mentioned, a cut on benefits that relate with health benefits, with different other cuts and the other freezes that are implemented through the plan. That turns into simply human suffering and affecting the livelihood of these teachers in their old age. They would have to work longer to receive less of a pension, and we are talking to the extreme of even $400 a month, when they would, under normal circumstances, would receive $1,000, $1,500. So it is a drastic change in the pension that they will receive eventually when they are able to retire. And I reiterate that it is done through an improper application of the preemption doctrine through the plan, without the Board having the authorization to do so. Thank you. Thank you. So, Counsel, if you would like another two to three minutes to complete your argument, you are welcome to it, but you have reserved some time if you'd rather wait. Well, Your Honor, I would just like to use the one or two minutes to emphasize the importance of this case being heard on the merits, because the importance of the legal questions that have been raised, the requirements to issue the stay are here, there is the irreparable damage and the likelihood of success, and the public interest favors that the stay is awarded so that the risk on the merits is not subject to a potential dismissal due to the technical difficulties caused by the passage of time. The teachers' associations deserve their day in court for this case to be heard on the merits, without the risk of the case being equitably moved, because as of right now, nothing is stopping the Oversight Board and the government from consummating the plan. And we have been diligent to request the court for an expedited briefing schedule so that the stay would not be as long as the opposing parties are portraying. And in that sense, it benefits all the parties to stay the proceedings so that the case can be heard and none of the parties, the opposing parties, for example, suffer the consequences of relying on a plan that could potentially be vacated by the determination of this court when the merits are heard. If it's okay, Your Honor, I will then reserve the three minutes for the rebuttal. Thank you, Counsel. If you would mute your audio and camera, we'll hear from Mr. Bienenstock. Good afternoon. May I begin? Yes. Thank you. May it please the court, my name is Martin Bienenstock, a partner at Proskauer Rose LLP, attorneys for the Oversight Board in its role as Title III representative of the Title III debtors at issue today. Although for the reasons in our papers, the board submits appellants have failed to establish the gating issue of a serious appellate issue, let alone a likelihood of success, I will start by addressing why the stay motion should be denied even if Your Honors conclude appellants have shown a sufficient legal prospect of reversal. And I will quickly get to many of the points that were the subject of Ms. Mendez-Colbert's argument. There are two key facts. First, we understand appellants cannot post any bond. Second, the board has conceded in its answering brief that without staying the effective date or overturning confirmation, the court will be able to award effective relief if it concludes appellants are right on their preemption or legislation arguments. And that's what teachers want, we understand, to preserve their defined benefit plans. And Judge Thompson would you present that argument to Judge Swain? No, Your Honor. We argue to Judge Swain that they didn't have even a serious legal issue and other arguments. We didn't get into equitable moodness, Your Honor. But in the motion, when you requested the motion for stay there, you didn't say that there may be another mechanism for adjustment so that if there's merit and they prevail, that you would be able to readjust the budget. No, we did not make that argument to Judge Swain.  And I know you represent the Commonwealth, but my assumption is that the budget represents monies that will go for the health and welfare measures of the Commonwealth. I mean, wouldn't the Commonwealth have an independent interest in that argument now? Oh, the Commonwealth and all the people do have an interest, as they've had throughout the case in that. And the board has been, as I've always put it, Your Honor, the board has been Congress's designated bad boy. The creditors don't think we're paying them enough and the people feel that we're cutting too many services and we've been trying to reach the right tradeoff to have a sustainable future and economy and be fair to creditors. And that's really, Your Honor, a great analogy to what's happening here. As is frequently the case in financial distress, the best result is the least worst result. And we were on a mission to find the least worst result in this particular appeal. The worst result, from the board's point of view, is for this court to delay confirmation, to delay the effective date. Because even if the board prevails on the appeal, every single day the effective date is delayed, costs millions of dollars, as I will get to in a few moments. And Your Honors have the declarations, largely from Ernst & Young, showing the tens of millions of dollars of additional liabilities and expenses. And from my own partner, Tim McGovan, about the $14 million a month that's costing the Commonwealth just to sustain these cases. So, on the one hand, we had a sure loss, even if we prevail on the appeal. On the other hand, we had a way of enabling the court to award effective relief, which is actually, although it's a negative thing that we'd have to further cut government services, which is Your Honor's point, and we agree, it's actually a positive thing that we'd be able to preserve our restructuring of roughly $30 to $40 billion of debt and $55 billion of pension debt without starting at square zero, which took us four and a half years. So, we had to weigh which was the least worst of all that. And we thought we came up with the best result, that we could preserve the restructuring, we could save all that money for the Commonwealth and debt service going forward because the restructuring cuts the bond debt mercilessly. They haven't been paid interest for the last four and a half years and they're not getting up one penny of that, and they're getting a percentage, 60% to 80% of the principal. So, we're preserving those massive savings to the Commonwealth while also saying to the teachers, if they prevail, we'll be able to reinstate their program. Now, I was as bad a mind reader of Ms. Mendez-Kohlberg as she was a mind reader of me and the Oversight Board. But Judge Kayada and Your Honor, Judge Thompson, got it right. We were not commenting on her probability of success when we made this concession on equitable mootness. We were doing what I just explained. We were choosing the least worst result for the Commonwealth. Now, failure to post a bond is reason enough to deny a stay. But here, the availability of effective relief after the occurrence of the effective date eliminates any need for the stay. In this court's Kofina opinion at 987 F. 3rd 173 at page 185, Judge Kayada wrote that the court recognizes in some cases it's possible to modify a standalone component of a plan to satisfy an idiosyncratic claim. In Kofina, that could not be done because as the court pointed out at page 186, the court could not tweak a deal that split up the revenues and change the 46.35% of the Commonwealth's revenues to 46.35% minus $316 million. As the court said, it faced an up or down decision, affirm or vacate. Here, that is not the case. There are lots of deals, but none of them carve up every dollar of revenue. The teachers can be paid more without paying any other credit or less. Now, I'm a bad mind reader too because I thought that would lead the teachers to come to court to say we've resolved our issues, but obviously it didn't. The appellant's rejoinder is the board previously represented the plan would not be feasible, and Your Honor has discussed that earlier, and Judge Thompson correctly pointed out that the board backed up and said, well, we'll have to find the savings somewhere. We're doing that, as I explained, to avoid sure losses. Exhibit 11 to the board's opposition is the declaration of Sheva Levy of Ernst & Young. In paragraph 23, she shows that the cost over 30 years of a three-month delay in the effective date is $65 million, six months, $185 million, nine months, $281 million, one year, $408 million, and over the 30 years, it would be $4.7 billion. Counselor, could you just address why March 15 is a sacred date? It's a sacred date for many different reasons. The first reason is that the bondholders' deal has a deadline which they extended from December 31 to March 15. The second reason is that this was on the record of the confirmation hearing but not in this particular appeal at the moment, except if you were to look at the overall transcript. The experience in the aftermath of the restructurings of Detroit and similar municipalities is that good things happen. Investment pours in once the debt situation is cleared up. Every day of delay is a delay in investment, new jobs, etc. When you have a community that has as low a labor participation rate as Puerto Rico has and a poverty rate as large as it has, every day is critical. Another reason, as I mentioned, people often use this to criticize professionals like myself, time is money. Every month this case lasts, as our exhibit shows, is another $14 million. Every month is another $14 million. With respect to your first item, are you telling us that the bondholders claim a right under the terms of the settlement with them to walk away from the deal if the plan does not become effective on March 15? That's what they claim, and we know why. There is a March 15 date. Now, Your Honor might say they're bluffing us and we understand the negotiation game, but the problem is the Commonwealth has been accumulating cash in big numbers and it could be economically attractive to the bondholders to renegotiate their deal. We don't want to play poker with them if we don't have to and take that risk. So we got a notice this morning that this ad hoc group of PREPA bondholders were seeking the appointment of a mediator and that has a joint status report date of March 18. Yes, Judge, that's a totally different case. I'm trying to figure out how that impacts the March 15 date. There's absolutely no correlation or connection. The ad hoc bondholders are bondholders in the electric utility. That is, the plan for the electric utility has not been proposed, it's not confirmed, it's not part of this appeal. It's another case that is pending in Puerto Rico and it's a governmental case, but it has nothing to do with the Commonwealth's Title III plan. Another bad problem in delaying the March 15 date, and it's all a matter of time, if it gets delayed into July 1, then the contribution under the plan to the Pension Reserve Trust that's supposed to protect all of the retirees, including the teachers, will be $960 million less than if we have the effective date before July 1. So that's why I said before, we know for sure there's going to be a loss if this court stays the effective date. How much of a loss will depend on how long it gets stayed. But we thought we found a solution, and we think we did, that we could have no loss if the court can simply reinstate the defined benefit plan for the teachers if it determines that they are in the right. When you say no loss, you mean no loss under the plan, but there would be presumably a corresponding loss to everyone else in Puerto Rico who's depending on the expenditures that you would then be cutting from the budget? Yes, Your Honor, and as I said, that's been the case from the outset. There are a lot of creditors out there who say we should have made bigger cuts to pay creditors, cuts in government services to pay creditors more, and vice versa, depending on who you are. And we're very transparent about what we're doing to accommodate the different issues and needs as they come up. And could those cuts mean cutting employment of teachers? Well, Your Honor, I'm in no position to say how the Oversight Board will allocate the cuts. I would say this, though. We have a declining population. Puerto Rico's population was 4 million people not so long ago. Now we're down to about 3.2 or 3. So right-sizing the government is necessary no matter what. And the Board has been doing that during the last four and a half years to some extent. And I should emphasize... Well, they say part of that decline is because people are fleeing Puerto Rico for better economic opportunities, including teachers. That's certainly part of the reason. And that's certainly why we tried as best we could to maintain the attractiveness of Puerto Rico. And we've given raises to teachers, to policemen, to firemen. This appeal happens to raise an issue where we might have to cut things, but there have been plenty of raises over the four and a half years and more to come. So let me just follow up on that. So you're saying that the Board has the capacity if it looks as if the result of the cuts is depleting the teacher workforce to make necessary adjustments to attract professional teachers to the profession? Well, hopefully we wouldn't... We're trying, without any new motivation, to attract the best teachers to the profession just as we're trying to attract the best medical workers in all fields, professors, et cetera. We're also trying to create new incentives throughout the entire workforce, all the civil employees, to attract the right people and to have the best workforce we can. And it's not lost on us that even if you are... Even if we have too many employees per capita, terminating an employee is not necessarily good because you have to pay them something possibly, and it's better to have people employed for their dignity and all kinds of human reasons. So the Board has... As I said, this is all a balancing act, and the Board has been doing the best it can for the last four and a half years, continuing through what we're suggesting in this appeal. Now, Judge Howard was quite correct. PROMESA Section 207 bars any new debt without Oversight Board approval, and PROMESA Section 108A2 bars the enactment, implementation, and enforcement of any new laws that impair or defeat the purposes of PROMESA in the view as determined by the Oversight Board. So, yes, we would be able to deal with new legislation and new debt going forward. We also agree those issues are not right. They're not before the Court today in the context of confirmation. And as Your Honors were correct to point out, Section 1123A3 of the Bankruptcy Code is the ultimate preemption. It gives the Oversight Board power to propose a treatment for every claimant. And let me emphasize, the treatment of the retirees, including and especially the teachers, is much more favorable than the treatment of any bondholder. They're being paid 100% of every benefit they earn through the effective date of the plan, and for the defined benefits they would like to earn after the effective date, we didn't say there will be none. We substituted defined contribution plans and Social Security and other benefits. Why did we do that? Because defined benefit plans are one of the primary causes of the island's financial distress in the first place. It created the situation that the Board was handed $55 billion of liability with virtually zero funding behind it. And notwithstanding that we're fighting our way out of that situation, the retirees have been paid in full during the last four and a half years. The bondholders did not receive one penny during the last four and a half years. So the Board has clearly made the trade-offs that I think Your Honors are asking about in favor of the people. We understand it has to be attractive, that people should have dignified lives, etc. And I think the actions of the Board have carried them out. As I think Judge Howard was alluding to earlier, when you have financial distress, there has to be some restructuring of the obligations. So we've restructured, in the case of the public employees, the obligations they will earn in the future. Because that's what caused the problem in the first place. We have to do that. Otherwise there was no purpose in Congress passing PROMESA and asking the Oversight Board to restructure the debt. Mr. Beenex, you mentioned 1123A3. There must be some limiting principle there when it said notwithstanding otherwise applicable non-bankruptcy law. For example, I doubt you could specify a treatment that said you would murder the claimants. Of course. So what is the limiting principle that precludes you from doing that extreme hypothetical but allows you to basically render ineffective the pre-existing pension laws? Well, the principle is it starts with the bankruptcy power in Article 1, Section 8, Clause 4 of the Constitution and the Supremacy Clause that the bankruptcy power is supreme over non-federal laws. I would think of it this way, Your Honor. And this applies not only to PROMESA Title 3, it applies to Bankruptcy Code Chapter 9. Governments, municipal governments, although they issue debt like corporations do, they tend to legislate their debts. And every jurisdiction has laws providing that valid debts are supposed to be paid and they're enforceable. If those laws are not preempted, displaced by the federal law, you cannot discharge debt or reorganize. The statute that the teachers want to preserve that creates defined benefits going forward is basically a contract that says, if you work, you will accrue certain additional benefits. That's what collective bargaining agreements and other employment contracts do. The fact that they put it in a statute as shown by the Supreme Court's decision in Ohio v. Kovacs doesn't make it impervious to discharge. The Bankruptcy Code Section 1015, as Judge Wayne wrote, defines a claim as a right to payment. Whether the right to payment comes out of a statute or a contract, it's a right to payment. If it's a right to payment, it can be discharged. As Judge Howard said earlier, you can present value the obligation and discount it in bankruptcy. There's no special treatment of it because it's in a statute. And we're not near the line. Obviously, we're not providing a treatment of murder or anything like that. But we're not near any other type of line. We're giving a conventional... We're taking an obligation and saying, instead of paying you X, we're going to pay you Y. There's nothing special about it. This is plain, vanilla bankruptcy. And we hope that the defined contribution plans will earn lots of money and maybe the teachers won't be worse off. But we can only do the best we can. Are there situations in the bankruptcy code where a plan of reorganization provides an ongoing post-effective date limitation on things that the debtor can do? Are you asking whether there's something in the bankruptcy code that puts a limitation on what the debtor can do? I mean, when you get rid of a contract, you get rid of it forever. The preemption over laws requiring payment of debt is a preemption forever. Every jurisdiction, including Massachusetts, has laws, statutes, and jurisprudence that says you have to pay your valid debts. And if you don't, you get a judgment. You give it to the sheriff, and you levy on assets. What I'm trying to get at is PROMESA has these provisions that even post-effective date of the plan, post the plan of adjustment, the board continues to exist and to exercise substantial supervisory and budgetary control for a number of years. And I'm asking, is that something that's peculiar to PROMESA that you would not find in the bankruptcy code, where some entity, such as the trustee or someone, continued with a supervisory role over the debtor after a plan of reorganization is approved and implemented? Oh, absolutely. That's unique to PROMESA. We look at Titles I and II of PROMESA as quite separate from Title III. Title III is the functional equivalent or analog to our bankruptcy reorganization case. Titles I and II create the oversight board to have control over the fiscal plan and the budget. And I want to point out, the budget is legislation. So my adversary's statement that the oversight board has no legislative power is incorrect. The budget is legislation, and the oversight board can impose it. But again, that's not an issue that's ripe in this appeal, at least not at the moment. Counsel, as to that, so do you see Titles I and II as in any way bolstering or supporting the notion of the injunction against enacting new legislation? I will tell you that, although I'm having trouble seeing who in this current appeal has standing to raise that claim, it does trouble me a little bit that in this plan, there would be an injunction against that kind of legislation. And I was thinking that perhaps, as a practical matter, given that under Titles I and II, the board's got this ongoing authority, it's going to be able to control the budget anyway. Therefore, that somehow might bolster the enactment of the injunction. But I continue to look somewhat in vain for other authority that supports the injunction that Judge Chiara was referring to, I think. Okay. Your Honor, there are two things that I think are responsive to that. The first is, the government was a party to the confirmation, the Commonwealth. And the government had a lot to say about that injunction. The second response, and the government could have filed a notice of appeal. It didn't. The second thing is that the reason for that injunction was actually demonstrated at the confirmation hearing. As we were literally in the week of closing final arguments at the confirmation hearing, the legislature enacted a statute reimposing the defined benefit plans that the Title III plan was eliminating. And as you can imagine, we immediately said to Judge Swain, we don't want to confirm this plan if the day after we have new defined benefit plans. And we immediately filed a complaint to nullify those plans, as we're allowed to under Section 108, 104K, 207 of PROMESA. And we didn't even have to go to trial. The Commonwealth, the governor stipulated with us that those statutes should be nullified. But it was because the legislature, and this was not the first time, and this court has ruled on several provisions that we had to nullify under Section 108. So what that injunction says, and it's not a black and white situation, the injunction says that if they want to reimpose certain types of defined benefit plans within a certain time frame, they have to go to the court and show the need for it and why it's reasonable. Counsel, this might just be on my end, but I'm hearing a noise. Is there anything that can be done about that? It sounds like an alarm is going off. It might have been. I think what happened, Your Honors, I apologize, is I had set the timer on my phone and I was just able to turn it off now. Good deal. This is an unrelated question and I'm actually a little embarrassed to ask it, but maybe I could call on you to help me out here. With respect to current retirees, and the rejection of executory contracts, is there no requirement that there has to be something left to be done on both sides in order for it to be an executory contract? What does the retiree still have to do? Okay. In connection with the retirees, we didn't treat them as executory contracts. We treated them as simply having claims. It was the active employees who have to work in order to accrue a future defined benefit. So we analogize that to a contract because the Puerto Rico courts say that that statute creates contractual obligations. But frankly, the contract aspect is almost irrelevant because whether it's a contract or not is clearly a claim. And claims are what are dealt with under Title III. Could I have just one minute to address Act 53? Yes. The entirety of appellants' argument on their reading of Act 53 to require not eliminating defined benefit plans is the phrase zero cuts to pensions in Article 605. So the issue is what zero cuts to pensions means. Are they talking about just accrued pensions or pensions to be earned after the effective date? As it turns out, that phrase is explained in the fourth paragraph of the Statement of Motives of Act 53, which is Exhibit 6 to our apposition. The Act provides the Commonwealth supports the plan, which includes zero cuts to pensions of current retirees and current accrued benefits of active public employees. So I just wanted to point out that Act 53 actually says up front exactly what it means by zero cuts to pensions. The other point is there's only one debt authorization section in Act 53, and that's Article 104. And it has a simple declarative sentence that says the Legislative Assembly authorizes the issuance of the general obligation bonds and CDIs subject to the FOMB filing an amended plan for confirmation by the Title III Court that eliminates the monthly benefit modification. There is nothing ambiguous about that. There is no requirement other than what was done. We eliminated the monthly benefit modification. I thank you for the additional time. Other questions from the Court with Mr. Beanstalk? All right. Thank you. Thank you. If you would mute your audio and your camera. Ms. Mendez? Yes, Your Honor. Can you hear me? Yes. Okay. Thank you. Well, I will try to address some key points from Mr. Beanstalk's argument. First, to the question of Judge Thompson as to why they didn't mention this alternative to Judge Swain is because they have portrayed to the Court always that these cuts and reforms were needed because otherwise the plan itself would be unfeasible. With respect to Act 53 and the public policy of zero cuts, I would address the Court to Article 605 of Act 53 that it is cited in its entirety in our brief, not in the Oversight Board's brief, but it says the resultatory condition of the effectiveness of the law. Yes, the issuance of the bonds could be conditioned to the elimination of the monthly benefit modification, but the effectiveness of the law is conditioned to zero cuts. It says contingent to zero cuts if they are decreed or implemented under the Debt Adjustment Plan or the Restructuring Debt. Therefore, that's the language that the Board has been ignoring. On the other hand, the Commonwealth obviously has an interest on the health and welfare of its people, but sadly, it doesn't have a voice here because the Oversight Board is the only one that controls these restructuring proceedings. That is why the Commonwealth what could do was to establish a public policy of zero cuts in Act 53 because that's the power that they have to legislate. How do you respond to counsel's assertion that the Commonwealth didn't appeal the plan? Well, Your Honor, I couldn't speak for the reasons for the Commonwealth to act or not act, but it did so when it enacted Act 53 and it established a public policy, but that was obviously ignored by the Oversight Board. In fact, the Governor expressed that the issue of the freeze and the cuts was not regulated, was not part of the text of Act 53. On the other hand, with respect to the races that Mr. Bienenstock has mentioned for the teachers, those races are with federal funds for which the Oversight Board has no jurisdiction and that's why they didn't oppose the races. Apart from that, those races are not coming from the general fund of the Commonwealth as it is. March 15 is the date that the Oversight Board has stated with the settlement with the bondholders to be the effective date, but it was extended before, so there's nothing that prevents them from extending that date, especially when here the court has already granted an expedited briefing of this appeal. In six days, the Oversight Board is going to file the response. We have seven days for the reply and then it's just a matter of the oral argument and, of course, the time that the court takes to decide the case. It is not that much time and the effective date could be extended. It's in the interest of even the bondholders because is it really in their best interest to withdraw from the settlement to then be left with what? The dismissal of the Title III and then suing the government when they have better possibilities with the settlement that they just have. It's just a matter of extending the date not for a year or even six months for that matter. Also, if the board is presenting now this alternative remedy and if the board is actually able to do it without their statements about this reinstatement being unfeasible, creating unfeasibility on the plan, then, as I mentioned, a solution could be a partial stay of the proceedings just with regards to the retirement system aspects of the plan. That would not, a partial stay would mean that none of the freezes, cuts and reforms of the retirement system could be implemented until the court issues the decision but then the other parts of the plan could be implemented and the harms that have been alleged because of the stay are practically related to the consummation and the effectiveness of the plan as a whole so they would not be affected by a partial stay. And in that sense, a partial stay serves as an equitable remedy for all the parties. Lastly, Your Honors, I would like to for my last remarks, this is not just any bankruptcy. This is a case that is more than just debt restructuring. This is the case about the future of a people. The teachers are defending their future. These teachers educate the country. They serve our people and it is only fair that they can live their retirement years in a dignified way, that they are able to work and educate our children now without worrying if they will be able to support themselves in their old age. In our motion, you could see the declarations under oath of the teachers that show that their monthly benefits would be reduced to $400, $300 to support a family. The unwavering will of the oversight board cannot prevail over the teacher's right to a dignified life. The teachers deserve better, Your Honors. We all do. Thank you. Thank you, counsel. Thank you both. We will take this under advisement for the time being and we will decide as quickly as we can. That concludes the argument for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this Honorable Court. Counsel, you may disconnect from the meeting. Thank you.